UNITED STATES of America,
Plaintiff,

v.

MERCHANTS MUTUAL BONDING COMPANY, A Corporation,
Defendant,

v.

R. L. MADISON and Helen M. Vust,
Third-Party Defendants,

and

Benson-Quinn Company, Lee Smith, et al.,
Interpleaded Defendants.

Civ. No. 1201.

United States District Court
N. D. Iowa, W. D.
July 23, 1963.

Donald E. O'Brien, U. S. Atty., Sioux City, Iowa, for plaintiff.

Marvin J. Klass, Sioux City, Iowa, for defendant.

Nelson & Stienstra, Sioux City, Iowa, for third-party defendants.

Paul A. Mahr, Paul J. Yaneff, U. A. Morgan, Charles M. Gasser, Sioux City, Iowa, Creasy & Metcalf, Moville, Iowa, for interpleaded defendants.

HANSON, District Judge.

This is an action brought by the United States of America based upon the claim of Commodity Credit Corporation. Jurisdiction is conferred by 15 U.S.C. § 714b(c). The United States alleges that Commodity entered into a grain storage agreement with Martin Vust doing business as Correctionville Elevator and Mill. The United States alleges that the warehousemen and warehouse were licensed under the Iowa Bonded Warehouse Law, Chapter 543, Code of Iowa, I.C.A.

The United States alleges that Merchants Mutual Bonding Company is a surety on a certain bond in which Martin Vust doing business as Correctionville Elevator and Mill is the principal and Commodity Credit Corporation, a wholly owned corporate agency and instrumentality of the United States of America, was a beneficiary. The United States alleges that the bond was dated August 6, 1958, and a rider was attached dated September 17, 1958. The United States alleges the sum of the bond to be $58,000.00.

The United States further alleges the following:

1. That the obligee under the bond is the State of Iowa for the use and benefit of any person lawfully entitled to receive the same in compensation for damages growing out of the principal's operation of warehouse under the provision of Chapter 543, Code of Iowa, I.C.A., and licensed under said Act, License No. W-2315; and that the bond is conditioned upon said principal's faithful performance of the duties of a licensed warehouseman in conformity with the provision of Chapter 543, Code of Iowa, I.C.A.

2. That under the aforesaid Uniform Grain Storage Agreement, Commodity deposited or caused to be deposited in the warehouseman's warehouse licensed under the provision of Chapter 543, Code of Iowa, I.C.A., 213,616.36 bushels of corn for storage, for which corn the warehouseman issued warehouse receipts. Between April 4, and May 11, 1960, Commodity surrendered the aforesaid warehouse receipts to the warehouseman and directed him to load out and redeliver to Commodity all of the corn thereby represented. Notwithstanding the foregoing, the warehouseman loaded out and redelivered to Commodity only 137,509.57 bushels of corn, leaving a shortage of 72,654.51 bushels, which quantity of corn the warehouseman had wrongfully converted to his own use. In addition, the corn loaded out and redelivered to Commodity by the warehouseman was of a lower grade and quality than that specified in the applicable warehouse receipts surrendered by Commodity. Moreover, the warehouseman claimed and was paid for warehousing services in and about the 72,654.51 bushels of corn which he had converted to his own use, to which he was not entitled under the terms of the aforesaid Uniform Grain Storage Agreement. As a result of the warehouseman's aforesaid breaches of the aforesaid Uniform Grain Storage Agreement, plaintiff has been damaged in the net sum of $89,724.-86.

3. That under the aforesaid Uniform Grain Storage Agreement, Commodity deposited or caused to be deposited in the warehouseman's warehouse, licensed under the provisions of Chapter 543, Code of Iowa, I.C.A., 2,699.72 bushels of soybeans for storage, for which the warehouseman issued warehouse receipts. About May 6, 1960, Commodity surrendered all of the aforesaid warehouse receipts to the warehouseman and directed him to load out and redeliver to Commodity all the soybeans thereby represented. Notwithstanding the foregoing,

the warehouseman failed, neglected and refused to redeliver to Commodity said 2,699.72 bushels of soybeans, which he had converted to his own use. Moreover, the warehouseman claimed and was paid for warehousing services in and about said soybeans which he had converted to his own use, to which he was not entitled under the terms of the aforesaid Uniform Grain Storage Agreement. As a result of the warehouseman's aforesaid breaches of the aforesaid Uniform Grain Storage Agreement, plaintiff has been damaged in the net amount of $5,352.16.

4. That under the aforesaid Uniform Grain Storage Agreement, Commodity deposited or caused to be deposited in the warehouseman's warehouse, licensed under the provisions of Chapter 543, Code of Iowa, I.C.A., 6,336.29 cwt. of grain sorghums for storage for which the warehouseman issued warehouse receipts. On or about April 11, 1960, Commodity surrendered the aforesaid warehouse receipts to the warehouseman and directed him to load out and redeliver all of the grain sorghums thereby represented. Notwithstanding the foregoing, the warehouseman loaded out and redelivered to Commodity only 6,015.40 cwt. of grain sorghums, leaving a shortage of 320.89 cwt. of grain sorghums, which the warehouseman had converted to his own use. In addition, the grain sorghums redelivered by the warehouseman to Commodity were of a lower grade and quality than that represented by the warehouse receipts surrendered by Commodity. As a result of the warehouseman's aforesaid breaches of the aforesaid Uniform Grain Storage Agreement, plaintiff has been damaged in the sum of $809.66.

5. That by reason of the foregoing, the conditions of said warehouseman's bond have been breached by defendant's principal to plaintiff's damage in the sum of $58,000.00, and there is now due and payable to plaintiff from defendant the aforesaid sum of $58,000.00, no part of which sum having been paid.

Merchants Mutual Bonding Company answered the Complaint by the United States and admitted paragraph 4 of the Complaint which reads as follows, to-wit:

"Defendant, Merchants Mutual Bonding Company, is surety on a certain bond dated August 6, 1958, a rider thereto dated September 17, 1958, and a rider thereto dated August 21, 1959, in the principal sum of $58,000.00, naming Martin Vust, doing business as Correctionville Elevator and Mill, Correctionville, Iowa, principal; the State of Iowa for the use and benefit of any person lawfully entitled to receive the same in compensation for damages growing out of the principal's operation of warehouse under the provision of Chapter 543, Code of Iowa, and licensed under said Act, License No. W-2315, as obligee; and conditioned upon said principal's faithful performance of the duties of a licensed warehouseman in conformity with the provision of Chapter 543, Code of Iowa,"

and admits that no part of the sum allegedly due to plaintiff from defendant has been paid.

Merchants Mutual Bonding Company amended its Answer to the Complaint of the United States and alleged that the action is based solely upon rights under the provisions of Chapter 543 of the 1958 Code of Iowa, I.C.A. and that the plaintiff cannot maintain this action under the provisions of said Chapter 543.

The United States replied to this defense or answer of Merchants Mutual Bonding Company as follows, to-wit:

"1. On or about September 17, 1958, the defendant Merchants Mutual Bonding Company made and executed a rider to the bond sued upon in this action wherein said Bonding Company agreed to give Commodity Credit Corporation (hereinafter designated as CCC) 90 days notice in the event of cancellation of said bond.

"2. That said rider is and has been a standard requirement on all bonds posted by bonded warehousemen within the State of Iowa and the defendant Merchants Mutual Bonding Company has executed similar riders in numerous instances on bonds on which it is surety for bonded warehousemen in the State of Iowa.

"3. That said defendant was at all times aware that C.C.C. was relying on said bond for protection.

"4. At no time did the defendant Bonding Company, directly or indirectly, ever state or indicate to C.C.C. that it disclaimed liability to C.C.C. on the bond sued upon in this action or other similar bonds furnished by it in the State of Iowa.

"5. The defendant Merchants Mutual Bonding Company has waived the legal defenses relative to non-liability to the plaintiff as asserted in its Second Defense and is estopped to deny liability on the bond sued on in this action."

Merchants Mutual Bonding Company then filed a counterclaim for interpleader. In this counterclaim, Merchants Mutual Bonding Company alleges that there are a number of other claims against the same bond which the United States is claiming against and that the total of these claims is in excess of the principal sum of the bond. Merchants Mutual Bonding Company amended this claim for interpleader to list additional parties who may have claims against the bond.

The United States replied to the counterclaim for interpleader and admits that its claim alone is in excess of the limits of Merchants Mutual Bonding Company's liability on the bond. The Court ordered that the following parties identified in the counterclaim for interpleader and amendment thereto be joined: Benson-Quinn Company, Lee Smith, Dale Powell, John Moon, Al Henrichsen, Max Flathers, Maurice Shever, Lloyd Stines, Wayne Smith, Dick Deeds, Eugene Baker, Lester Wright, Stanley Fitch, Roy Walker, Tom Cobb, Gilbert Baker, and Roy Stines.

The Court later ordered that Ronald Randolph be joined as a party defendant and that his pleadings be permitted to stand.

R. L. Madison and Helen Vust were impleaded by Merchants Mutual Bonding Company. The allegations of Merchants Mutual Bonding Company against these third-party defendants are as follows:

"Defendant, Merchants Mutual Bonding Company, is surety on a certain Warehouseman's Bond dated August 6, 1958, a rider thereto dated October 6, 1958, and a rider thereto dated August 21, 1959, in the principal sum of $58,000, on which bond Martin Vust, doing business as Correctionville Elevator and Mill, Correctionville, Iowa, is principal.

"In consideration of Defendant, Merchants Mutual Bonding Company, executing said bond as surety and in order to induce said Defendant to remain as surety on said bond, 3rd-Party Defendant, R. L. Madison, executed an Application for Bond of said Martin L. Vust in which said R. L. Madison agreed to indemnify and save harmless the said Merchants Mutual Bonding Company for, from, and against any and all losses, costs, damages and expenses of every nature whatsoever, including counsel fees and expenses, which may accrue to the said Bonding Company by reason of its having become surety on said bond. Said indemnity was limited to the sum of $22,000.

"In the event Plaintiff (United States) is held to be entitled to a judgment against Defendant, (Merchants Mutual Bonding Company), then pursuant to said Application for Bond and Indemnity Agreement executed by R. L. Madison, Defendant and 3rd-Party Plaintiff would be entitled to judgment against said 3rd-Party Defendant, R. L. Madison, to the extent of said judgment but not in excess of $22,000 together with Attorney fees, expenses, and Court costs incurred by Defendant.

"Under date of March 5, 1959, Martin Vust executed an Application for Bond in the sum of $36,000 and in consideration of Defendant, Merchants Mutual Bonding Company, executing the bond applied for and to induce said Defendant to continue to retain said bond in force, 3rd-Party Defendant, Helen M. Vust, signed an Indemnity Agreement together with said Application in which she agreed to indemnify and save harmless the said Merchants Mutual Bonding Company for, from and against any and all losses, costs, damages and expenses of every nature whatsoever including Counsel fees, expenses, and costs which may accrue to the said Defendant by reason of its having become surety on said bond.

"In the event that a judgment shall be rendered in this action in favor of Plaintiff against Defendant, Merchants Mutual Bonding Company, said Defendant and 3rd-Party Plaintiff, is entitled to recover judgment against 3rd-Party Defendant, Helen M. Vust, for the amount of such judgment to the extent of $36,000, together with Attorney fees, expenses, and costs in connection with said 3rd-Party Complaint."

R. L. Madison answered the 3rd-Party Complaint filed by Merchants Mutual Bonding Company and alleged:

"The 3rd-Party Defendant, (R. L. Madison), herein admits that the plaintiff, United States of America, has filed against the defendant, Merchants Mutual Bonding Company, a corporation, a Complaint, but the 3rd-Party Defendant, R. L. Madison, herein denies the materiality of said Complaint, and for further answer to Paragraph One, Count I, of the 3rd-Party Complaint, the defendant states that said Complaint known as Exhibit A fails to state a cause of action.

"The 3rd-Party Defendant herein, R. L. Madison, without consideration did execute an Application for Bond with the defendant and 3rd-party plaintiff herein. That said Application was specifically limited and that said limitation specifically provided 'indemnity limited to that amount of bond #122557 which exceeds $36,000.00, but in no event more than $22,000.00.' That in no event would the liability of the 3rd-Party Defendant, R. L. Madison, commence until such time as the defendant and 3rd-Party Plaintiff herein had already expended the sum of $36,000.00.

"That the Application signed by the 3rd-Party Defendant, R. L. Madison specifically provided that the liability of R. L. Madison would not commence until the defendant and 3rd-Party Plaintiff, had already expended the sum of $36,000.00.

"That the 3rd-Party Defendant, R. L. Madison, did execute and 'Application for Bond' on or about the 31st day of August, 1959, as shown in Exhibit F of 3rd-Party Complaint and that there was no consideration for obtaining the signature of the 3rd-Party Defendant herein.

"That at the time the signature of the 3rd-Party Defendant, R. L. Madison, was obtained on the 'Application for Bond' on the 31st day of August, 1959, certain statements and promises were made by Martin Vust and Chas. Isbell to said 3rd-party defendant that were untrue and which induced said 3rd-Party Defendant to sign said Exhibit F and that the signature of R. L. Madison was obtained by fraud."

R. L. Madison also answered plaintiff's reply to the second defense of Merchants Mutual Bonding Company as follows:

"The Third-Party Defendant (R. L. Madison) herein specifically alleges that the said Third-Party Defendant had no knowledge of any kind or nature of any Rider by and between the Plaintiff herein and the Defendant Merchants Mutual Bond-

ing Company and that the Merchants Mutual Bonding Company as of September 17, 1958 had no authority to bind the Third-Party Defendant herein in any way or nature.

"The Third-Party Defendant herein specifically alleges that the said Third-Party Defendant was never informed in any way, form, shape, or manner of any 'standard requirement on all bonds posted by bonded warehousemen.'

"The Third-Party Defendant herein specifically alleges that the Third-Party Defendant had no knowledge or any reliance on the part of the C.C.C. and of any agreement of any kind or nature between the Plaintiff herein and Defendant Bonding Company.

"The Third-Party Defendant herein specifically alleges that the acts of the Defendant Bonding Company in no way bound the Third-Party Defendant herein.

"The Third-Party Defendant specifically alleges that the alleged Rider was purportedly signed on or about the 17th day of September, 1958 and that the Third-Party Defendant herein did sign an Application with the Defendant Bonding Company herein on or about the 31st day of October, 1959. That the Defendant Bonding Company in no way indicated to Third-Party Defendant herein that the liability under the warehouse bond in question herein in any way exceeded what was stated on said application or that it exceeded Chapter 543 of the Iowa Code of 1954 and that the Third-Party Defendant herein was never informed of any possible liability involving the Plaintiff. That in no event should the liability of the Defendant to the Plaintiff herein exceed $22,000.00 and that even in the event Judgment is granted in favor of the Plaintiff as against the Defendant Bonding Company that said Defendant Bonding Company is not entitled to Judgment over and against the Third-Party Defendant, R. L. Madison."

Statements presented by Merchants Mutual Bonding Company and United States of America for pretrial consideration are as follows:

"The above case involves the following issues:

"1. Whether defendant is liable to the United States of America under the claim made in the complaint. The issue of the liability under the bond itself was decided by Judge Graven in the case of United States v. West View Grain Company, D.C., 189 F.Supp. 482. In this case, Judge Graven held that the Government was not covered by the bond, and the bonding company was not liable under the bond to the Government. However, the West View Grain Company case did not decide the issues of whether the Government could prevail on the basis of estoppel or waiver.

"2. Whether the Third-Party-Defendant, R. L. Madison, is liable to the defendant on its coindemnity agreement for any sum in excess of $36,000.

"3. Whether defendant is liable to any of the other party-defendants who have claims under the bond issued by defendant.

"4. If the Government prevails, is there any priority for its claim over that of the other party-defendants who have claims on the bond?

"In the event the Government does not prevail on its claim nearly all the other issues will be resolved because there likely would be no defense against the other party-defendants except for one. On the other hand, if the Government does prevail, then the defendant likely would pay the bond proceeds into Court and require the parties to interplead as to the share of such proceeds to which they might be entitled. For these reasons, the

Merchants Mutual Bonding Company suggests to the Court that the claim of the United States first be tried before any of the issues involving the other parties be presented for hearing. It is quite likely that there will be no further litigation once the issue involving the Government's claim is determined."

At the pretrial conference the parties agreed that the claim of the United States against Merchants Mutual Bonding Company and the indemnifier, R. L. Madison, should be tried before any of the issues involving the other parties were presented and tried.

This portion of the cause came on for trial on January 28, 1963. Evidence was offered on behalf of plaintiff, defendant, and third-party defendant, R. L. Madison. The Court also allowed any interpleaded parties to present evidence. Defendant, Lee Smith, offered evidence in his behalf and made further statements.

The issues raised at this trial were in substance:

(1) Is there a contractual liability which has been incurred by the defendants, Merchants Mutual Bonding Co. and R. L. Madison which is now due and owing to the United States;

(2) Are the defendants, Merchants Mutual Bonding Company and R. L. Madison estopped to deny any contractual obligations now due and owing to the United States; and,

(3) Is there now a liability which has been incurred by the defendants, Merchants Mutual Bonding Company and R. L. Madison, under the provisions of Chapter 543 of the Code of Iowa, I. C.A. which is now due and owing to the United States.

The parties have filed and answered a number of interrogatories and have made a number of admissions pursuant to requests therefor. The substance of these are as follows:

The following are the admissions by Merchants Mutual Bonding Company in the pleadings:

That exhibits B, C, and D attached to the plaintiff's Complaint are true and exact copies of the bond and riders attached thereto;

That Merchants Mutual Bonding Company is the surety on the said bond and attached riders; and,

That no sum alleged to be due the United States from Merchants Mutual Bonding Company has been paid.

*Admissions in the Interrogatories:*

Merchants Mutual Bonding Company was requested to execute Rider No. 122,-557, Exhibit C, about September 17, 1958. Mr. Charles D. Isbell of the Isbell Agency, Correctionville, Iowa, was the person who requested the Rider, Exhibit C, which was executed by M. J. Corbin. The request for the Rider, Exhibit C, was made in writing. The Rider is in the Home Office of Merchants Mutual. The transmittal letter or document which is the request for the Rider, Exhibit C, is in the Home Office of Merchants Mutual. The Rider, Exhibit C, was mailed by Merchants Mutual to the Iowa State Commerce Commission. Merchants Mutual states that the Rider, Exhibit C, was executed because this was requested by the Isbell Agency.

Plaintiff made the following request for admission of fact:

"The form of rider appended to the complaint as Exhibit C was presented for execution to defendant Merchants Mutual Bonding Company, Des Moines, Iowa, with a slip of paper attached thereto by a staple, reading as follows:

" 'Surety bonds filed with the Iowa State Commerce Commission qualify for substitution for bonds to Commodity Credit Corporation provided that the bond filed with the Iowa State Commerce Commission includes a rider providing for ninety (90) days notice to Commodity Credit Corporation prior to cancellation of the bond. A specimen copy of the form of rider required for this purpose is attached. Please

obtain the rider from your surety and forward it to this office.' "

The answer to the request states:

" * * * that the slip of paper referred to therein might have been attached to the rider referred to as Exhibit 'C' in the Complaint, but Defendant does not have any record of whether or not such slip of paper actually was attached to said Exhibit 'C'. Hence, it is unable to definitely confirm that said slip of paper was attached to said Exhibit 'C'."

It is admitted that the rules and regulations of the Iowa Commerce Commission governing bonded warehouses under Section 543.3, Code of Iowa, I.C.A., are Exhibit G appended to the request for admission.

It is admitted that the Correctionville Elevator and Mill was licensed under the provisions of Chapter 543, Code of Iowa, I.C.A., at all times pertinent to the issues of this case, until such license was suspended by the Iowa State Commerce Commission on or about March 28, 1960.

It is admitted that no corn, grain, sorghums, soybeans, or other grains were received into the grain storage facility known as Correctionville Elevator and Mill subsequent to April 27, 1960.

It is admitted that the form of rider marked Exhibit C was transmitted for execution to defendant Merchants Mutual Bonding Company by the Isbell Agency, Correctionville, Iowa, with an accompanying memorandum, a true copy of which is marked Exhibit L. Exhibit L states:

"Will you please execute the enclosed forms in connection with the above bond?

"No doubt you are familiar with the way in which bonds filed with the Iowa State Commerce Commission are substituted for the bonds to the Commodity Credit Corporation. We assume that it will be necessary to file a copy of this bond with the rider attached with the Commodity Credit Corporation. If that is the case, please send the copy of the bond to this office and we will have Mr. Vust send it on to the Commodity Credit Corporation with his application.

"/s/ Charles D. Isbell."

*Admissions of R. L. Madison:*

That R. L. Madison did execute an Application for Bond with the defendant and Third-Party Plaintiff, Merchants Mutual Bonding Company; and,

That R. L. Madison signed and executed bond application shown as Exhibit F attached to the Third-Party Complaint. A portion of Exhibit F reads as follows:

"The undersigned further agrees to indemnify and save harmless the said Company for, from and against any and all losses, costs, damages and expenses of every nature whatsoever, including counsel fees and expenses, which may accrue to the said Company by reason of the said Company having become surety on said bond.

"The *undersigned hereby further agrees that* the vouchers or other evidence of *payments made by the said Company under its obligations of suretyship shall be conclusive evidence against the undersigned of the fact and extent of the undersigned's liability to the said Company under said obligation of the undersigned,* whether such payments were made to discharge a penalty thereunder, incurred in the investigation of a claim made thereon or adjusting a loss or claim in connection' therewith, or in completing the work covered thereby, and whether voluntarily made or paid after suit and judgment against said Company. * * * " (Emphasis added)

*Most significant parts of the admitted exhibits:*

Excerpts from Exhibit B, the Warehouseman's Bond:

" * * * lawful money of the United States for the use and bene-

fit of any persons lawfully entitled to receive * * * compensation for damages growing out of the operation of said warehouse under the provisions of Chapter 543. * * *"

"The conditions of the above obligation are such that: If the said Martin Vust dba Correctionville Elevator & Mill, Correctionville, Iowa, *shall faithfully perform the duties of a licensed warehouseman, in conformity with the provisions of the said Chapter 543*, The Code, 1954, as amended By Acts of The 56th General Assembly, * * * upon notice by the Surety by registered mail, to the Principal and to the Iowa State Commerce Commission, and upon refund of premiums paid pro-rated to final cancellation date, *obligations of the Surety shall cease* at the end of the tenth day after receipt of such notices *as to any future acts of the Principal other than such acts as may relate to warehouse receipts that are then outstanding. The obligation as to such outstanding receipts shall continue* to the end of the stipulated storage period evidenced by the receipt *in accordance with Section 543.23.* * * *" (Emphasis added)

"Countersigned in Iowa

"By /s/ Chas. D. Isbell

"Resident Agent"

Exhibit C reads as follows:

"RIDER

"To be attached to and form a part of Bond No. 122,557 issued by the 'Merchants Mutual Bonding Company, Des Moines, Iowa in the amount of $24,000.00, in favor of the Iowa State Commerce Commission, on behalf of Martin L. Vust dba Correctionville Elevator and Mill.

"In consideration of the premium charged for the attached bond, it is hereby agreed:

"1. In the event the Surety decides to cancel the attached Bond, it shall so notify the Commodity Credit Corporation by Registered Mail addressed to Joseph Haspray, Director, Evanston CSS Commodity Office, 2201 Howard Street, Evanston, Illinois, at least 90 days prior to the effective date of such cancellation.

"2. This rider shall become effective as of August 6, 1958.

"3. The attached Bond shall be subject to all its terms, conditions and limitations except as herein expressly modified.

"Signed, sealed and dated September 17, 1958."

Exhibit D shows the principal sum of the bond was increased to the sum of $58,000.00.

Exhibit F (the Application for Bond signed by R. L. Madison (contains the following:

" * * * The undersigned further agrees to indemnify and save harmless the said Company for, from and against any and all losses, costs, damages and expenses of every nature whatsoever, including counsel fees and expenses, which may accrue to the said Company by reason of the said Company having become surety on said bond.

"The *undersigned hereby further agrees that* the vouchers or other evidence of *payments made by the said Company under its obligations of suretyship shall be conclusive evidence against the undersigned of the fact and extent of the undersigned's liability to the said Company under said obligation of the undersigned* whether said payments were made to discharge a penalty thereunder, incurred in the investigation of a claim made thereon or adjusting a loss or claim in connection therewith, or in completing the work covered thereby, and whether voluntarily made or paid after suit and judgment against said Company. * * *" (Emphasis added)

The United States admits that Form Iowa C.C.W–4 is the form that has been used since enactment of the Amendment to Section 543.1(7) of the Code of Iowa, I.C.A. by the 59th General Assembly. The United States admits with qualifications that Form 33 is the standard form bond of Commodity Credit Corporation. These are attached to defendant's Request for Admissions.

The parties have entered into a stipulation as to the amount of damages incurred by the United States as a result of Martin Vust's failure to redeliver grain stored by Martin Vust for Commodity Credit Corporation. This has made it unnecessary for the parties to introduce evidence as to the amount of loss sustained in that such loss was actually sustained by reason of Martin Vust's failure to faithfully perform his agreements with the United States. The stipulation is as follows:

"The undersigned stipulate that the damages incurred by the United States of America as a result of the failure of Martin Vust to redeliver to Commodity Credit Corporation all grain stored by said corporation was in excess of $58,000.00. This Stipulation shall not prejudice the right of the United States to establish damages sustained by the United States in excess of the sum of $58,000.00 against other parties to this action by way of interpleader to establish the pro rata share to which the United States is entitled out of the funds available."

This Court is faced with a companion case in this instance which involves United States v. Tyler, D.C., 220 F.Supp. 386, Central Division, and the present case under consideration, No. 1201 Civil, Western Division. United States v. Tyler has not been fully and completely tried. The ruling in that case has been precipitated by a Motion to Dismiss or for Judgment on the Pleadings by Home Indemnity Company of New York, one of the defendants in that cause. Opinions in the two causes are being submitted simultaneously by reason of their identical issues.

Due to the elaborate character of the pleadings, the Court feels that the issues, the allegations, and the nature of the case are fully set out and explained. There is no necessity of making any further statement of the case.

### FINDINGS OF FACT

1. The defendant, Merchants Mutual Bonding Company, assented and agreed to act as surety on the contract for storage between the United States and the surety's principal, Martin Vust.

2. The United States and the warehouseman entered into a valid contract of storage.

3. The warehouseman breached this contract.

4. Commodity was damaged in an amount in excess of $58,000.00.

5. Commodity relied upon and had a right to rely upon the surety's assenting to act as surety on the grain storage agreements between Commodity and Martin Vust.

6. Merchants Mutual Bonding Company, by now refusing to act as surety on the grain storage agreements between Commodity and Martin Vust, is taking a position inconsistent with the position taken at the time that the bond, Exhibit B, and the Rider, Exhibit C, were executed.

7. Merchants Mutual Bonding Company intended that Commodity should deposit grain in the warehouse operated by Martin Vust in reliance upon the bond, Exhibit B, and the rider, Exhibit C.

8. Merchants Mutual Bonding Company should have reasonably foreseen such reliance and did foresee such reliance.

9. Merchants Mutual Bonding Company should have reasonably foreseen that Commodity would in reliance on the action taken by Merchants Mutual Bonding deposit grain in the warehouse for which Mutual was acting as surety.

10. Commodity substantially changed their position as a result of the actions of Merchants Mutual Bonding Company by depositing grain in the warehouse and not demanding any surety other than Merchants Mutual Bonding Company.

11. Commodity had no reason to know Merchants Mutual Bonding Company would refuse to perform as surety on the contracts between Commodity and Martin Vust.

12. Merchants Mutual Bonding Company mislead Commodity by leading them to believe that they were acting as surety on the contracts between Commodity and the warehouseman, Martin Vust.

13. The Court further finds that on Exhibit B Merchants Mutual Bonding Company held out Charles D. Isbell to be their resident agent.

## CONCLUSIONS OF LAW

### ADDITIONAL CONTRACTUAL LIABILITY:

Defendant, Merchants Mutual Bonding Company, contends that their liability and obligation can rise no higher than that which can be predicated upon the statutory bond which is required by Iowa law for warehousemen under Chapter 543 of the Iowa Code, I.C.A. as such statute existed at the time the agreements in question were made. The defendant alleges that under the statutory bond required by this Chapter as it then existed, a surety on the bond would have no obligation to insure the warehouseman's faithful performance contracts for storage of grain with Commodity Credit Corporation.

If, for the moment, this allegation of Merchants Mutual Bonding Company is taken as correct, but that Merchants Mutual Bonding Company did actually agree to act as surety for Martin Vust on the grain storage contracts between Martin Vust and Commodity, then and in that event, the surety would have taken on an obligation additional to those obligations required of it under the bond issued pursuant to Chapter 543, Code of Iowa, I.C.A., as it then existed.

This raises the question as to whether this obligation additional to the obligations in the statutory bond is enforceable or whether a statutory bond should be limited to the obligations required by the statute despite a broader intention by the parties involved.

■■ Iowa law controls as to what the Iowa statute was intended to mean. However, federal law controls the rights of Commodity under its contracts. United States v. McCabe Co., 261 F.2d 539 (8th Cir., 1959).

■ The law is settled that a surety is bound by what he has assented to. Mundy v. Stevens, 3 Cir., 61 F. 77; Leach v. Commercial Sav. Bank, 205 Iowa 1154, 213 N.W. 517, 527; United States v. McMullen, 222 U.S. 460, 32 S.Ct. 128, 56 L.Ed. 269 (Holmes, J.) R.S. of Surety, Secs. 83, 85, 88.

■ The undertaking of a paid surety engaged in that business for profit is considered by the Iowa Court to be controlled by the rules applicable to insurance contracts rather than by rules applied to an accommodation surety. Rowe v. Stufflebeam, 249 Iowa 985, 89 N.W. 2d 875, 878, 879. The same rule was applied in Massachusetts Bonding & Insurance Co. v. Feutz, 182 F.2d 752 (8th Cir., 1950). The court said:

"The defendant, however, is a compensated surety and in the construction or interpretation of the contract of such a surety the contract is construed most strongly against the surety and in favor of the indemnity. Such a contract is to be regarded as in the nature of an insurance contract governed by the rules applicable to insurance contracts * * *."

In the present case, the meaning of the bond and the rider is ambiguous because the meaning of the rider which is part of the bond must be reconciled with the surety's allegation that the United States cannot sue on the bond.

There are also a number of other ambiguities that must be interpreted. Was the notice in the rider to supplement the notice in the bond wherein Section 543.23 is referred to? Also, what is the significance of the specific reference to Section 543.23? When the condition states " * * * shall faithfully perform the duties of a licensed warehouseman * * * ", does this mean all of the warehouseman's duties under the statute or does this in some way mean a limited number of his obligations? It is clear from the statute that the warehouseman has obligations to all depositors and that the United States can be a depositor. When the bond refers to " * * * warehouse receipts that are then outstanding * * * ", does this mean all of the warehouse receipts of the warehouseman then outstanding? When the bond refers to " * * * obligations as to such outstanding receipts shall continue * * * in accordance with Section 543.23 * * * ", does this mean all warehouse receipts referred to in Section 543.23? Is that part of the bond which reads: " * * * for the use and benefit of any persons lawfully entitled to receive the * * * compensation for damages growing out of the operation of said warehouse under the provisions of Chapter 543 * * * " inconsistent with the other parts of the bond mentioned above? Also, the Court must give meaning and reason to the rider. Why did Commodity Credit Corporation ask for the rider? Why did Merchants Mutual Bonding Company grant the rider? In relation to Exhibit D, why was the principal sum of the bond raised to $58,000.00?

Recourse must be had to the circumstances and other documents known to all parties in order that the Court may determine their intent. Peterson v. Miller Rubber Co., 8 Cir., 24 F.2d 59; Massachusetts Bonding & Insurance Co. v. Feutz, supra.

■ A contract of suretyship is normally between the surety and his principal; in this case, Martin Vust and Merchants Mutual Bonding Company. The obligee or beneficiary, in this case Commodity, is in the nature of a third-party beneficiary. The surety is bound to those obligees or beneficiaries that he has assented or agreed to be bound to. In this case, the question is whether the bond, the rider, and the other circumstances show that the surety agreed to be bound to the United States.

■ The standard used to determine whether or not this agreement was made is an objective one. The rule is well known. Castor v. Coppock, 211 F. 2d 136 (8th Cir., 1954); Corbin on Contracts, Section 104; Restatement of Contracts, Sections 233 and 228. See also Comment (a) of Section 228 in Restatement of Contracts and the Comments under Section 228 in Iowa Annotations to Restatement of Contracts. Also Section 622.22 of the Iowa Code, I.C.A. This rule is that Merchants Mutual Bonding Company is bound by that meaning of its words which it knew or had reason to know that the other parties would give to the words. This rule applies where the intention of the parties is unclear, or in the words of the Restatement, where there is no integration. There is no integration in the present case. The bond designates the beneficiaries unclearly. It designates them as those to whom duties are owed under Chapter 543 and as those who may lawfully receive compensation for damages out of the operation of the warehouse under Chapter 543. Also, because of the rider, there is evidence that they specifically intended that Commodity was to be a beneficiary under the bond.

■ It may be that if the bond, Exhibit B, alone was being interpreted, this standard of interpretation would not be used, but in order to determine whether Merchants Mutual expressly agreed that the United States was to be a beneficiary under the bond, the bond itself, the rider, Exhibit L, and the surrounding circumstances must be considered and the standard of interpretation which must be used is that statement set out above

in Castor v. Coppock, supra, and the other authorities cited. But see also R.S. of Contracts, Sec. 231.

The present case takes on some of the aspects discussed by Corbin on Contracts, Sections 792 and 793. These things bothered Corbin when used only to get around a requirement of privity, but in this case, this theory fits the facts of the case. Certainly, there is no reason why the beneficiary cannot make a direct agreement with the surety. R.S. of Surety 83, 85, 88.

■ Charles Isbell was the agent of Merchants Mutual who requested that this rider be attached to the bond. The notice to the agent is notice to the corporation and the knowledge of the agent is the knowledge of the corporation. M. F.A. Mutual Insurance Co. v. Jackson, 271 F.2d 180 (8th Cir., 1959); Schram v. Burt, 6 Cir., 111 F.2d 557.

There is no question but that Charles Isbell had knowledge of the thinking of Commodity Credit Corporation when they requested the rider be attached to the bond. This is shown by Exhibit L which Merchants Mutual admits was sent to them by Isbell with the request for the rider. Exhibit L is evidence that Commodity intended and believed it was to be covered by the bond. This admission shows that Merchants Mutual and Isbell had actual knowledge of what Commodity was thinking and intended in this respect. In Fidelity & Deposit Co. of Md. v. State of Montana, 9 Cir., 92 F.2d 693, at p. 697, the court said:

"The agent of the appellant was shown to have been familiar with the nature of the business conducted by Chatterton & Son and with the fact that its Billings warehouse was used solely for the handling and storage of beans. There is persuasive evidence that the parties intended to execute a bond for the protection of those using the warehouse for that purpose. Indeed, if that was not the purpose of the instrument, it served no purpose at all. Since the bond was written up on a printed form obtained by appellant's agent from the State of Montana, it is easy to understand how the mistake occurred resulting in the failure of the instrument to express the true intent of the parties."

Merchants Mutual Bonding Company has placed some emphasis on the fact that a new form of bond is now being used by Commodity in Iowa. This casts no reflection on what the intent of the parties was concerning the bond now being interpreted. It only makes sense and is good draftsmanship for a party who has been forced into much litigation over a problem to write its subsequent agreements so as to be sure of avoiding the problem which resulted in the litigation.

The reason no express written agreement was made between the parties showing that they all intended that Commodity was to be covered by the bond is undoubtedly because they all at that time believed the United States was already covered by that bond, and could sue on the bond under Section 543 of the Iowa Code, I.C.A.

There are a number of reasons why the Court feels the bond, Exhibit B, itself shows that the parties intended the United States was to be covered by the bond before the rider, Exhibit C, was ever signed. The Court takes note of the fact that the bond itself makes special reference to Section 543.23. The bond states that if the surety shall desire to cancel the bond, it would remain in effect as to outstanding receipts in accordance with Section 543.23. Section 543.23 deals with termination of storage contracts. This Section states that a storage contract shall have a forced termination: "On termination or lawful cancellation of bond provided and failure of the warehouseman to immediately replace same."

Section 543.24 says that "In the event of forced termination of a storage contract as provided in section 543.23, the warehouseman shall provide such reasonable opportunity as the circumstances

will permit for the depositor or other person entitled to delivery of the storage products to take possession of the storage product." The reasonable interpretation of this part of the bond is that the warehouseman did not want his storage contracts all terminated if the surety would suddenly terminate its bond.

When you say that the United States is not covered by the bond, you are saying that when "receipt" is mentioned in the bond, it means all the receipts referred to in Section 543.23 except the United States receipts. This exception is not expressed but unless it is construed to be in the bond, the phrase "storage contract" in Section 543.23 cannot include the United States storage contracts and the word "depositor" in Section 543.24 cannot include the United States. In other words, to conclude that the United States is not covered by the bond is to conclude either that no duty is owed to the United States under Sections 543.23 and 543.24, or it is to conclude that the obligations owed to the United States by the warehouseman are greater than the obligations owed to the United States by the warehouseman's surety. There are able reasons why neither of these latter two conclusions could have been intended. First, the condition of the bond states that it will guarantee the duties of a licensed warehouseman in conformity with the provisions of said Chapter 543. Here again you would have to say either that it does not cover duties owed to the United States or that no duties are owed under these statutes to the United States.

Secondly, you cannot help reaching the conclusion that there are duties under Chapter 543 which can be owed by warehouseman to the United States.

Section 543.28 shows that it is contemplated that the United States would be a depositor in the licensed warehouse. Section 543.18 states that warehouse receipts shall be issued for all agricultural products that become storage in a licensed warehouse. This conclusively shows that when the United States (as

contemplated in Section 543.28(3)) becomes a depositor, a receipt must be issued to the United States. Section 543.-18(3) states that this receipt must be issued subject to the Iowa Bonded Warehouse Act and the rules and regulations prescribed thereunder. This is conclusive that duties can be owed by the licensed warehouseman to the United States. When the surety, the warehouseman and the depositor entered into this bond, they could hardly have intended the surety to have fewer obligations to the depositor than the warehouseman. Yet, if you say that the United States is not intended to be covered by this bond, that is the distinction in obligations which must be read into its guarantee of the warehouseman's performance.

 Under Section 543.23, a storage contract has a forced termination if the bond is cancelled and is not immediately replaced. Therefore, if the United States storage contract was not covered by the bond it did not, in this particular case, have lawful existence under this statute. Section 543.24 talks of the depositors under the storage contracts which are considered in 543.23. It seems clear that Section 543.23 meant storage contracts to exist only when insured and bonded. The only way they could exist is if "storage contract" in Section 543.23 does not include United States storage contracts.

No one knew at the time this bond was executed what meaning would be given to Section 543.14 by the courts as it had not been previously interpreted.

The bond does say that it is for the use and benefit of any *persons* lawfully entitled to receive compensation for damages growing out of the operation of said warehouse under the provisions of Chapter 543. If the United States is not a person in this clause, it is inconsistent with literal words of other parts of the bond. Certainly when this Section is considered, when the other language of the bond is considered, and Exhibits C and L are considered, it was reasonable for Commodity to believe that

the United States was intended to be covered by the bond.

Having now decided that Merchants Mutual Bonding Company is held to have agreed to act as surety on the Grain Storage Agreements, the next question is whether or not this agreement is enforceable if it is an obligation not contemplated by Chapter 543 of the Iowa Code, I.C.A.

The rule is that where a bond was by mistake or otherwise voluntarily substituted by the parties for the statutory bond, it is enforceable notwithstanding the statute required different obligations than the parties intended and contracted for. Indemnity Insurance Co. of North America v. United States, 5 Cir., 74 F.2d 22; United States v. Tingey, 5 Pet. 115, 30 U.S. 115, 128, 8 L.Ed. 66; United States v. Hartford Accident & Indemnity Co., 2 Cir., 117 F.2d 503; National Surety Co. v. Peoples Milling Co., D.C., 57 F.Supp. 281; Southern Surety Co. v. Dawes, 161 Ga. 207, 130 S.E. 577; Robinson Clay Product Co. v. Beacon Const. Co., 339 Mass. 406, 159 N.E.2d 530; Hartford Accident & Indemnity Co. v. United States, 127 F. Supp. 565, 130 Ct.Cl. 490; State ex rel. Bronteager v. Mundy, 53 N.D. 249, 205 N.W. 684; United States v. Continental Casualty Co., 139 F.2d 770; Osceola County v. Michigan Surety Co., 264 Mich. 8, 249 N.W. 445, 450, 4 Cir., 88 A.L.R. 636 (concurring opinion); Cases on this subject are collected in 18 A.L.R. 1227 and 93 C.J.S. Warehousemen & Safe Depositaries § 15, p. 414.

In a number of these cases, the variance from the statute was more than a mere matter of form, e. g., Southern Surety Co. v. Dawes, supra; Hartford Accident & Indemnity Co. v. United States, supra. In most of these cases cited, the variation from the statute was apparently by mistake. In Southern Surety Co. v. Dawes, supra, the variation was that the parties intended beneficiaries other than the statute.

In Hartford Accident & Indemnity Co. v. United States, supra, the court said that the statute was for the benefit of the United States and that the surety couldn't complain of the deviation. It is to be noted that in that case, the statute would have apparently prevented the Government from assessing liquidated damages against the surety. Nonetheless, the court was probably applying the correct rule. The party for whose benefit the statute existed is the only party that should be able to complain about its deviation from the statute. In the present case, Chapter 543 was not written for the benefit of surety companies. It was written for the benefit of depositors. See Fidelity & Deposit Co. v. Montana, supra. In National Surety Co. v. Peoples Milling Co., supra, the court said the contract controls unless some principle of public policy is violated. Of course, the statute can be read into a statutory bond, but this does not mean that the bond cannot have obligations in addition to those of the statute.

If Merchants Mutual Bonding Company did agree to act as surety on the government contracts, then even if this obligation is in addition to the obligations required of the surety under the statute, the effect of the statute upon this additional obligation in favor of Commodity would be governed by the rule of United States v. McCabe Co., supra. In that case, the court said that the rights of Commodity cannot be limited by a state statute or state rule of law. The court said that Congress had no intention to make the rights of Commodity subservient to state law. Therefore, if the agreement is an obligation of the surety in excess of the obligations required by the statute, the obligation is not predicated on the statute and the statute has no effect in preventing the enforcement of the obligation. There is no indication that the Commodity Credit Corporation intended that it should be bound by any state law in enforcing its contracts.

Based upon the facts in the record and upon the law as cited, the Court concludes that Merchants Mutual Bond-

ing Company must be held to have assented and agreed to allow Commodity Credit Corporation to be a beneficiary on its bond shown in Exhibit B. The Court further concludes that the assent and agreement give Commodity enforceable rights against Merchants Mutual Bonding Company notwithstanding any possibility that these rights might not have been conferred by Chapter 543 of the Iowa Code of 1958, I.C.A.

*ISSUE OF ESTOPPEL:*

 The United States also alleges that the surety is estopped from asserting that the obligations under the statute are different from the obligations arising out of the agreement among the parties by which the surety assented to act as surety on the grain storage agreements between Martin Vust and Commodity. Estoppel does not create a contract but the general rule is that if in making a contract, the parties agreed upon or assumed the existence of a particular fact as the basis of their negotiations, they are estopped to deny the fact as long as the contract stands, in the absence of fraud. Triphagen v. Labbe, 332 Mich. 583, 52 N. W.2d 226 (1952); 19 Am.Jur. 634, Sec. 34; Woodard v. General Motors Corporation, 298 F.2d 121 (5th Cir., 1962). This rule has been applied where the fact assumed was a question of the interpretation of a statute. Carroll v. National Surety, 58 App.D.C. 3, 24 F.2d 268; Sisseton v. Western Surety Co., 50 S. D. 205, 208 N.W. 982; Bell v. Kirkland, 102 Minn. 213, 113 N.W. 271; Fidelity & Deposit Co. v. Madson, 202 Wis. 271, 232 N.W. 525; American Surety Co. of N. Y. v. City of Akron, 6 Cir., 95 F.2d 966; Hartford Acc. & Indemnity Co. v. United States, supra.

 All the elements of estoppel are present in this case. The parties assumed that the United States was covered by the statutory bond and contracted on that basis. They cannot now deny what was the very basis of the agreement. The cases cited show that when the parties had contracted assuming the law allowed the contract to be enforced, they cannot then, after the other party has fully performed, escape their performance by claiming that the law made the contract invalid.

Even if the surety company is presumed to know the law (see Fidelity & Deposit Co. of Md. v. Montana, supra, 92 F.2d p. 697), this is all the more reason for an estoppel as they would then fully realize that Commodity was being mislead to its prejudice.

*ACTION BASED UPON CHAPTER 543, CODE OF IOWA, I.C.A.:*

This third issue is of great concern in the ultimate disposition of this type of case. Here we have the construction and interpretation of a legislative enactment as proclaimed in Chapter 543 of the 1958 Code of Iowa, I.C.A. In addition to this, the Court is faced with the persuasive and scholarly opinion written in United States v. West View Grain Company, D.C., 189 F.Supp. 482. At one juncture, the eminent trial court mentioned a citation of the Iowa Supreme Court, as follows, to-wit:

"To sustain plaintiff's argument would be to hold the legislature did not mean to say what the language it used plainly means. It is pertinent to repeat here the much quoted admonition of the late Justice Oliver Wendell Holmes, 'We do not inquire what the legislature meant. We ask only what the statute means.' * * * "

Many statements have been made with relation to the search for legislative intent. It has been referred to as being elusive. This reference amounts to understatement in the case at hand. The great jurist Hand has indicated that a search for legislative intent constitutes a reason for the existence of judges and indicated, in his words, that to find it constitutes a "delightful uncertainty."

The ruling in the West View case, supra, is purely confined to the matter of an interpretation of the statute, the court in said cause having stated that there were other phases which were to be de-

termined later. The other phases have been raised in this cause in the first two issues indicated. The West View case was closed in such a manner as never to result in a final appealable order. This was so by reason of the matters left undetermined and by reason of settlement.

Merchants Mutual Bonding Company claims that under a proper statutory construction, Chapter 543 of the Code of Iowa, I.C.A. as it existed at the time of liability on any bond given by them excluded the United States as an entity entitled to bring action for recovery on said bond. Actually, the entire Chapter must be looked upon for proper consideration of the ultimate result reached herein.

The legislative history as proclaimed in the West View case, supra, indicates the various steps and changes made from time to time since its enactment except since the time of the decision, the decision having been rendered on December 2, 1960. On March 6, 1961, at the very next session of the Legislature subsequent to the rendering of this decision, Chapter 267 of the Laws of the Fifty-Ninth General Assembly, being House File 49, was enacted. The statute as it existed prior to March 6, 1961, is hereinafter set out and the Chapter as it is today and subsequent to March 6, 1961, is hereinafter set out. In practically all instances, and in particular as the present statute was enacted in Chapter 246 of the Laws of the Fiftieth General Assembly, the title has been "Bonded Warehouses for Agricultural Products Act." It has in most instances been referred to as relating to bonded warehouses for agricultural products. The Act itself removes any doubts as to its purpose whatsoever.

The pertinent provisions of the Iowa Code, I.C.A. as indicated prior to March 6, 1961, were provisions in being at the time of the allegations of liability in this cause as follows, to-wit:

"543.1 *Terms defined.* As used in this chapter: * * * 7. 'Person' shall mean an individual, corporation, partnership, or two or more persons having a joint or common interest in the same venture, but shall not mean the United States or Iowa state government or any subdivision or agency of either. * * *"

"543.12 *Bond required.* Any person applying for a license or licenses to conduct a warehouse or warehouses in accordance with this chapter shall, as a condition to the granting thereof, execute and file with the commission a good and sufficient bond, other than personal security, to secure the faithful performance of his obligations as a warehouseman under the terms of this chapter and the rules and regulations prescribed hereunder, and of such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agricultural products in such warehouse. Any person applying for an amended license under the provisions of section 543.8 shall, as a condition to the granting of the amendment to his license, file such additional or substituted bond or such amendment to a bond already on file as will result in a bonded liability in total effect equivalent to the bonded liability which would be required if such person were applying for an original license for the storage of agricultural products of types and in amounts specified in the application for an amended license."

"543.14 *Action on bond.* Any person injured by the breach of any obligation of a warehouseman, for the performance of which a bond has been given under any of the provisions of this chapter, may sue on such bond in his own name in any court of competent jurisdiction to recover any damages he may have sustained by reason of such breach."

"543.17 *Acceptance of bulk grain for purposes other than storage.* * * * Provided, however, that in each instance of a deposit of grain by the United States government or

any subdivision or agency thereof, a period of thirty days shall be permitted in each instance where a period of ten days is above specified, and action which is specified above to be taken on the tenth day, shall be taken on the twenty-ninth day."

"543.19 *Rights and obligations with respect to warehouse receipts.* * * * and privileges of licensed warehousemen and other persons dealing with such warehousemen."

"543.24 *Sale of products in the event of forced termination.* In the ·event of forced termination of a stor-.age contract as provided in section .543.23, the warehouseman shall provide such reasonable opportunity as the circumstances will permit for the depositor or other person entitled to delivery of the storage products to take possession of the storage product."

"543.27 *Discrimination.* * * * without making any discrimination between persons desiring to avail themselves of warehouse facilities."

"543.28 *Rates.* * ' * * Provided, however, that a storage or delivery charge other than that specified above may be made, if such charge is required by the terms of a written contract with the United States government, any of its subdivisions or agencies, providing copy of such contract is filed with the commission. * * * "

These and other provisions of the statutes may from time to time be referred to.

After the decision in the West View case, supra, which occurred on December 2, 1960, and thereafter and on March 6, 1961, the following provisions of the Code as it relates to Chapter 543.1, subsection 7, is now as follows, to-wit:

"543.1. * * * 7. 'Person' shall mean an individual, corporation, partnership, or two or more persons having a joint or common interest in the same venture, and, except with respect to the privilege of operating a warehouse under this chapter, shall include the United States or Iowa state government, or any subdivision or agency of either. * * * "

The above set out sections of the 1958 Code of Iowa, I.C.A. under the title of "Bonded Warehouses for Agricultural Products" have not been changed except that "person" has been redefined as set out in the 1962 Code, I.C.A. above quoted. Thus, it may be seen that as of now and subsequent to March 6, 1961, the problem here involved cannot arise by reason of the destruction of any possible ambiguity of meaning.

It is clear that the Iowa cases say many times that the amendment to an existing statute is intended only to clarify the statute and not to alter the scope and purpose of it. Disbrow v. Deering Implement Co., 233 Iowa 380, 9 N.W.2d 378 (1943); State v. Local Board of Review, 225 Iowa 855, 283 N.W. 87.

The meaning of the word "person" in Chapter 543 is not clear. It is ambiguous. With much deference to the well written ruling in the West View decision, the court feels that this is a statute where the manifest intent of the legislature must prevail over the literal import of the words used. Dingman v. City of Council Bluffs, 249 Iowa 1121, 90 N.W.2d 742. This is the type of problem where the intent must be gathered from the Act as a whole and not from the ambiguous words alone, as if they were isolated and independent of the Act of which they are a part.

It is true that the Legislature is its own lexicographer, but as the Supreme Court said in Lawson v. Suwannee Fruit & S. S. Co., 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611: "Statutory definitions control the meaning of statutory words, of course, in the usual case. But this is an unusual case. If we read the definition into § 8(f) (1) in a mechanical fashion, we create obvious incongruities in the language * * *."

In United States v. Kurzenknabe, D.C., 136 F.Supp. 17, the court said you look to the intent of the Legis-

lature when the literal words would bring about an end completely at variance with the purpose of the statute. The Iowa court has expressly recognized this rule of construction. Young v. O'Keefe, 246 Iowa 1182, 69 N.W.2d 534, 537. (Citing 82 C.J.S. Statutes, § 315). In this case, the court was construing a well known word. In the case at point, the word "Person" is a well known word, but its normal meaning is inconsistent with the meaning attributed to it by the West View decision and the defendant, Merchants Mutual Bonding Company. The United States is normally considered a juristic person. United States v. Cooper Corp., 312 U.S. 600, 61 S.Ct. 742, 85 L.Ed. 1071; Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. The word "person" has no fixed and rigid signification. Commonwealth v. Welosky, 276 Mass. 398, 177 N.E. 656, 657; State of Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346. This rule was also recognized in State v. City of Des Moines, 221 Iowa 642, 266 N.W. 41, 43. The rule was followed in Birmingham v. Geer, 8 Cir., 185 F.2d 82 at p. 86.

The court believes the meaning of the word "person" in the statute is unclear and that the statute defines the word "person" in an ambiguous manner. The court realizes that this same issue was considered in the West View opinion and that this decision here is not consistent with that opinion. This court feels that the interpretation of the statute in the West View case is against the manifest intent of the legislation and results in obvious incongruities. The court in the West View case apparently felt that the results were not such as to apply the rule this court is using, but there the court did feel that as a result of that decision, the doctrine of estoppel might be applicable.

Section 543.17 clearly shows that it was anticipated that the United States might deposit grain in warehouses licensed under this statute. Section 543.12 says that the bond is to cover all the warehouseman's obligations, plus any additional obligations assumed by the warehouseman under his contracts with his depositors. The word "all" here would certainly imply that it meant all obligations to depositors, especially where this section gives no contrary implication. In light of these two sections, it then does not make sense to say that the United States cannot sue on this bond under Section 543.14. At this point, the meaning of Section 543.14 becomes unclear and must be construed in relation to the rest of the Chapter.

The word "person" is used in Section 543.12. There the word "person" was not intended to include the United States. The purpose of the exclusion was that the State of Iowa did not intend to regulate any warehouses owned or operated by the United States but the Legislature did intend that the United States should be able to deposit grain in warehouses owned privately and licensed by the State of Iowa; and further, the Legislature intended that when the United States did this, it would be able to be covered by the warehouseman's statutory bond. Section 543.17 shows that it was contemplated that the United States was going to deposit grain in the licensed warehouses.

The fact of the common practice of Commodity of taking assignments from the forms of their warehouse receipts, and the Iowa Legislature making these receipts negotiable would show that the Legislature expected that Commodity would be able to sue on this bond. If the United States could not sue on the bond, it would be impossible to negotiate the receipts because the United States would always have to first secure another surety. It is only with the doctrine that the assignment carries with it the surety that there can be an assignment of these negotiable warehouse receipts as intended by the Iowa Legislature. See Iowa Code Sections 542.3 through 542.7, I.C. A.

The general rules of law with relation to statutory construction have been clearly enunciated in Iowa. Where a statute is clear on its face, it is not

open to construction, but where the statute is ambiguous the court must ascertain the intent of the legislators, and this is the settled rule in Iowa where the ambiguity arose from a disagreement as to the scope of certain words. Dingman v. City of Council Bluffs, supra; Ferguson v. Brick, 248 Iowa 839, 82 N.W.2d 849, 852. In the Dingman case, the Iowa court said while quoting from the Ferguson v. Brick case:

"While generally speaking, words of a statute are given their ordinary meaning, words ought to be more subservient to the intent and not the intent to the words. * * * In ascertaining such intent consideration should be given to the Act as a whole and not to the ambiguous words alone, as if they were isolated and independent of the Act of which they are a part. (Citing cases)."

Statutory construction is properly invoked when the legislative acts contain such ambiguities or obscurities that reasonable minds may disagree or be uncertain as to their meaning. Palmer v. State Board of Assessment, 226 Iowa 92, 283 N.W. 415, 416; Dingman v. City of Council Bluffs, supra.

In Young v. O'Keefe, supra, the court stated that a legislative body may be its own lexicographer, but when it assumes the role of lexicographer, it must be treated as one. The court in that case said: "We are required here to interpret, not the language of the main pension provisions, but what purports to be the legislative definition of that language." The court in that case further said that " '[c]onstruction provisions' and 'definitions' may doubtless sometimes be themselves subject to judicial construction." In that case, the court was hesitant to construe the statutory definition because the purported legislative definition was the same as the well known meaning of the word. In this case, the opposite is true as the purported statutory definition is contrary to the accepted view of the United States as a juristic person. Far East Conference v. United States, supra.

In State v. City of Des Moines, supra, the court said in construing the word "person":

"Indeed, the Legislature itself has provided by statute, chapter 4, § 63, Code, under rules of construction that 'in the construction of the statutes, the following rules shall be observed, *unless* such construction would be inconsistent with the *manifest intent of the general assembly, or repugnant to the context of the statute,*' thus emphasizing the fact that the intent of the General Assembly is to override, if necessary, even the terms therein defined which are to govern ordinarily in the construction of statutes."

"Having ascertained from a consideration of the entire act and historical background revealed by prior statutes on the same subject the object and purpose which the law was intended to accomplish, it is the duty of the court to give it force and effect, if this can be done without running counter to established legal precedents. With the matter of the expediency of the measure we as a court are not concerned."

"Surely, in a sense, all corporations are persons, that is, artificial persons, and all municipalities are bodies corporate, and in a proper case the word 'person' has been held to not only include municipalities but every and any political subdivision, and also the state, and in some cases even the United States government. Stanley v. Schwalby, 147 U.S. 508, 517, 13 S.Ct. 418, 37 L.Ed. 259, 263. See, also, 48 C.J. 1137, where many cases are collated bearing on the question."

"In a recent case, State of Ohio v. Helvering, 292 U.S. 360, 54 S.Ct. 725, 727, 78 L.Ed. 1307, the Supreme Court of the United States said: 'Whether the word "person" or "corporation" includes a state or the United States depends upon the connection in which the word is found.' "

We have a legislative enactment here divided into numerous sections concerning the control and regulation of Bonded Agricultural Warehouses. In the case of Davis v. Davis, 246 Iowa 262, 67 N.W. 2d 566, the Court subscribed to Section 352, Title 50, Statutes, American Jurisprudence, which is as follows, to-wit:

"The different parts of a statute reflect light upon each other, and statutory provisions are regarded as in pari materia where they are parts of the same act. Hence, a statute should be construed in its entirety, and as a whole. The general intention is the key to the whole act, and the intention of the whole controls the interpretation of its parts. The fact that a statute is subdivided into sections or other parts should not obstruct or obscure the interpretation of the law as a whole. All parts of the act should be considered, compared, and construed together. It is not permissible to rest the construction upon any one part alone, or upon isolated words, phrases, clauses, or sentences, or to give undue effect thereto. The legislative intention as collected from an examination of the whole as well as the separate parts of a statute, is not to be defeated by the use of particular terms, but, to the contrary, will prevail over the literal import thereof."

It would seem that the only purpose that could possibly be attached to the exclusion of the United States, the Iowa State Government, or an agency thereof as provided in Subsection 7, Section 543.1 is that of regulating the United States or the Iowa State Government as warehousemen, and that it has no application to their subsequently becoming a depositor or person under the protection of 543.14. The subsequent clarification in the 1962 Code, I.C.A. clearly indicates this situation.

The purpose of this statute insofar as it relates to the matter of bond reduced to the most common understanding would be that it will protect those who have stored grain. The United States does not stand in the position of a warehouseman in these situations but stands squarely in the shoes of a depositor or person seeking relief from the bondsman by reason of an alleged breach. No one doubts the rule that if the United States brings itself within the provisions of a Legislative Act, it shall be permitted to pursue its remedy pursuant to the Act. Here the statute does not exclude the United States as a person. It excludes the United States as being regulated within the provisions of the statute as a warehouseman.

The legislative record is clear that Sections 543.12 and 543.14 were not only passed at the same time but in the same bill. Neither has there ever been any indication of change, and if the Legislature could have meant that the United States was not to be included within the provisions of 543.12, they could very well have said that the bond shall not be for the benefit of the United States or any agency or subdivision thereof. This they did not do. The Court in this instance feels that there is such an ambiguity as to justify this interpretation of the statute.

Every reason given for disallowing the United States the benefit of suit upon the bond must be predicated entirely upon the premise that the legislative enactment excludes it. It is the view of this Court reading this statute as a whole that the major premise is faulty, and in view of this, and in view of the ambiguity, the general rules of construction as they relate to the matter of ambiguity apply. The general law in support of the propositions as announced in the West View case are entirely correct if the view subscribes to excluding the United States by reason of Section 543.1, subdivision 7. A contrary view, which this Court believes, subscribes more closely to the provisions of the statute as a whole. Certainly, to apply rigidly the definition of "person" as subscribed to by Merchants Mutual Bonding Company in this cause leads to absurdity. These results can be and should be avoided.

State ex rel. Pieper v. Patterson, 246 Iowa 1129, 70 N.W.2d 838.

Under the West View decision, the surety on the statutory bond has no obligations to the United States. Yet it is unmistakable that the warehouseman can have obligations to the United States. This is another reason why Section 543.-14 is unclear and why the interpretation of it in the West View case does not accord with the intent of the legislators. Could the Act have intended the warehouseman's surety to have lesser obligations than the warehouseman? This Court does not believe that this was the intended result, but rather the Court believes that it was the intention of the Legislature that the surety was to cover all of the warehouseman's obligations and that even, as is stated in Section 543.12, it was to cover " * * * such additional obligations as a warehouseman which may be assumed by him under contracts with depositors of agriculture products in such warehouse."

The reasons why it is clear that the legislators must have intended that the United States would be a depositor and that warehousemen would owe obligations to the United States are already set out in this memorandum.

Also, the West View decision creates conflicts between the different Sections in the Chapter. As already explained, Sections 543.17, 543.18, and 543.28 contemplate storage by the United States in licensed warehouses. 543.18 says warehouse receipts must be issued for all agricultural products. Under 543.16, it would have been unlawful for Vust to have accepted for storage this grain if he had not done it as a licensed warehouseman. However, as already explained, if the United States is not a person entitled to sue under the statutory bond, then Commodity's storage contracts could not have been "storage contracts" as that term is used in Section 543.23. This is because storage contracts not bonded are automatically terminated and, therefore, could not come into effect if not bonded.

Under Section 543.15, the United States would be the holder of a licensed warehouse receipt and so would get the benefit of the required insurance. Could the United States have been intended to be covered by the insurance contracts, but not by the bond? The Court does not think this was the intent of the legislation. Could the Legislature have intended the United States to get the benefit of Section 543.15 but not the benefit of Sections 543.23 and 543.24? This Court believes this was not what was intended.

All these inconsistencies disappear if the United States can sue on the statutory bond. The Court feels that the Legislature did not intend the sections of the statute to be so inconsistent as to be absurd, but rather intended that they be consistent and that the United States could sue on the statutory bond.

LIABILITY OF R. L. MADISON

The liability of R. L. Madison to Merchants Mutual Bonding Company is based on the Application for Bond, Exhibit F. This contract says that payment by Merchants Mutual under the obligations of suretyship shall be conclusive evidence against R. L. Madison of the fact and extent of R. L. Madison's liability.

This Application makes no reference to the Iowa statute except that it refers to Bond #122557 to be issued to Martin Vust. The contract in no way indicates that the liability is to be in any way limited by Chapter 543 of the Iowa Code, I.C.A. The Application was given long after Commodity had deposited grain with Martin Vust.

R. L. Madison alleges that he had no knowledge of the Rider even though this was in force when he signed Exhibit F. He alleges that he did not have knowledge of reliance on the part of the United States. (This would mean no knowledge that Commodity was storing grain with Martin Vust and requiring no surety except Merchants Mutual). It is also alleged that R. L. Madison was never informed that liability under the bond might exceed the liability under Chapter 543 of the Iowa Code, I.C.A. and that

he was never informed of any possible liability involving the United States.

R. L. Madison agreed that payments by the surety under obligations of suretyship shall be conclusive of the fact and extent of R. L. Madison's liability. The only question is what did the parties mean by the term "obligations of suretyship." If they didn't mean to cover the obligations to the United States, then, of course, R. L. Madison is not bound to Merchants Mutual on the obligation as it relates to the United States. Merchants Mutual intended the words "obligation of suretyship" to cover the United States.

Before coming to the question of R. L. Madison's intentions, it is necessary to say something further respecting Merchants Mutual.

Merchants Mutual was found to have intended to cover Commodity under its bond. In making this finding, the Court relied largely but not wholly on the fact that Merchants Mutual knew the intentions of Commodity, i. e., knew Commodity intended to be covered by the bond. In this respect, the facts were like the famous case of Embry v. Hargadine, 127 Mo.App. 383, 105 S.W. 777. In that case, an employee said to his employer that he must have a year's contract or he would quit. The employer said: "Go ahead, you're all right. Don't let that worry you." The court held this to be a question for the jury as to whether the employee understood this to be an assent to a year's contract and whether the employer had reason to know that he did. In that case, like the present, it is not necessary to talk about the assent or acceptance being in the term of the offer or about silence being acceptance. From all the circumstances and documents, the court has found Mutual assented and intended to cover the United States.

The rule of Castor v. Coppock, supra, and Restatement of Contracts, 232, was used. This was used because there was either no integration, Restatement Section 228, or it was an ambiguous integration, Restatement rule 231. In the words of Corbin on Contracts: "It is generally stated that a promisor is bound in accordance with the meaning that he has reason to know will be given to his words by the promisee and that is so given. Without doubt, this rule has sound policy behind it; but its purpose can be attained without making it absolute and unlimited. Promisors will usually mean in fact what they have reason to know the promisee will understand them to mean." In this case, the court has found that Merchants Mutual had the intention that it knew Commodity believed that it had. It was not difficult to know what Merchants Mutual knew or had reason to know.

Where R. L. Madison's intentions are concerned, the problem is more difficult. For one thing, the evidence of their negotiations were not offered into evidence. However, the rule is essentially the same. Section 622.22 of the Iowa Code, I.C.A. applies. The agreement between R. L. Madison and Merchants Mutual was an ambiguous integration under Restatement of Contracts, Section 231. This is the Iowa rule. Section 622.22 is used to ascertain the intention of the parties to an ambiguous contract. Preston v. Howell, 219 Iowa 230, 257 N.W. 415, 419, 97 A.L.R. 1140; City of Des Moines v. City of West Des Moines, 244 Iowa 310, 56 N.W.2d 904. This is construing the instrument, Exhibit F, in favor of R. L. Madison. The question is did R. L. Madison have reason to know the intention of Merchants Mutual. The rule is used like the parol evidence rule, i. e., to prevent fraud. If the strict rules were not applied, a party could always avoid his contracts by saying that it did not express his intention and that, therefore, there was no meeting of the minds. When a party claims that an agreement does not express his intention, there may have been a mutual mistake or there may have been a unilateral mistake. Contracts are usually avoided where the mistake was mutual but not where the mistake was unilateral. To determine which kind of a mistake it is, there are a number of considerations. It is easy where there is evidence showing what the par-

ties should know; but again, in Corbin's terms: " * * * it is generally, if not always, impossible to show that there was 'reason to know.'" This is true as to the intention of R. L. Madison, and when this is so, there are a number of tests that are used:

(1) Which party's alleged intention was the most reasonable one.

(2) Which party was negligent.

(3) Have either of the parties shown reason for the intention they allegedly had. Employer's Mutual Casualty v. Piedmont Supply Co., D.C., 197 F.Supp. 159, pp. 166, 167.

(4) Has either party changed his position so that restoration of his former position is impossible.

(5) Was the mistake of substantial importance.

In this case, Merchants Mutual has changed its position and restoration to their former position is impossible. This would be almost always true in this type of agreement.

The intention of Merchants Mutual is known because of the evidence introduced in this case. R. L. Madison has offered no reason for him to suppose that Commodity would not be covered by the bond. He alleges that he was never told of this fact, but alleges no reason why he should think that Commodity was not covered by the bond. The West View decision cannot be a reason as it was not then in existence. The United States is a juristic person.

The next question is negligence. There is no way in which Merchants Mutual was negligent as it had no reason to suppose that R. L. Madison would think that the bond did not cover Commodity. R. L. Madison was the negligent party. At the time he signed the contract with Merchants Mutual, Commodity had been storing grain in the Martin Vust warehouse for some time. Commodity had no other bond. The Rider had been given to Commodity. Charles Isbell, who signed as witness, had knowledge of the facts concerning Commodity. In Preston v. Howell, supra, the Iowa court said

that recitals in an instrument put a party on notice. The bond was cited in R. L. Madison's contract and the rider is part of that bond.

Further, if R. L. Madison did not know who was covered by the bond or was intended to be covered by the bond, it is probably because he was not concerned with who was covered by the bond. This would not increase or decrease his risk of liability. It was not the depositor in the warehouse whose performance was being guaranteed. It was the performance of the warehouseman, Martin Vust, which was being guaranteed. This brings into play the other factor. The mistake was not of substantial importance, at least at the time it was made. See Jordan v. Brady Transfer & Storage Co., 226 Iowa 137, 284 N.W. 73, Note 4, p. 77. This is, of course, if R. L. Madison was mistaken. The Court has presumed this without finding it to be so in order to construe the agreement in favor of R. L. Madison. In the case of Employers Mutual Casualty Co. v. Piedmont Supply Co., the court said, "The defendants had every opportunity to read the agreements, and insist that they be limited as to scope and time, if they so desired. Under these circumstances, the defendants, having full opportunity for information as to the contents of the agreements, cannot escape the consequences on the ground of their omission to read them." In that case, the indemnitors had agreed to save the surety harmless from any losses it might have by reason of its execution of any bonds at any time in the future on behalf of one Arrow. The indemnitors, defendants, contended that the agreement covered only the bonds on the Capehart project. The court found no good reason for their having this intention, that they were negligent, that the agreement was clear, and the defendants were bound.

In the famous case of United States Rubber Co. v. Silverstein, 229 N.Y. 168, 128 N.E. 123, written by Cardozo, J., the defendant had said: "I [will be] good for what they buy," perhaps meaning to include only himself and one son. The

plaintiff understood the words to include two sons. Cardozo, J. said: "The promise, if uncertain, was to be taken in the sense 'in which the promisor had reason to suppose it was understood by the promisee.' * * * The jury were to fix the meaning in the light of all the circumstances." The jury found against the defendant. To the same effect is the recent case of Earp v. First State Bank of Abilene, Tex.Civ.App., 356 S.W.2d 178.

In all three of these cited cases, the mistake was much more important than the mistake, if any, in the present case. In these cases, the mistake went to the limits of the liability or to the person whose performance was being guaranteed. See also Durst v. Board of Directors, 228 Iowa 463, 292 N.W. 73. In this case as shown, it was not Commodity's performance which was being guaranteed and the limit of liability wasn't changed. At the time the agreement was signed, the parties probably wouldn't consider it too important whether Commodity was covered or not.

In this case, if R. L. Madison was mistaken as to whether obligations of suretyship were owed to Commodity, it was his unilateral mistake which will not avoid his contract. The reasons for reaching this result are already set out.

If neither Merchants Mutual Bonding Company nor R. L. Madison intended to cover Commodity, of course, Commodity would not be covered, but that is not the fact in this case.

If R. L. Madison had shown reasons for having an intention contrary or different from the intention of Merchants Mutual and there was no way of knowing which party had caused the mistake, then the result might be different, but again these are not the facts in this case.

■ R. L. Madison has alleged no consideration and misrepresentation but no evidence was offered on either of these defenses. In Iowa, consideration for a written contract is presumed and the burden was on R. L. Madison to estab-

ish this defense. Sisson v. Janssen, 244 Iowa 123, 56 N.W.2d 30.

## JUDGMENT AND DECREE.

Accordingly, it is hereby ordered, adjudged, and decreed that the defendant, Merchants Mutual Bonding Company, shall be liable unto the United States upon its bonds as surety for Martin Vust pursuant to warehouse receipts surrendered by the United States and pursuant to storage agreements.

It is further hereby ordered, adjudged, and decreed that the third-party defendant R. L. Madison is liable unto the defendant, Merchants Mutual Bonding Company, on its co-indemnity agreement pursuant to said instrument.

It is further ordered that all other matters relating to priority of claims and amounts and issues raised in the pleadings not herein disposed of shall be disposed of by subsequent proceedings and in accordance with the judgment herein rendered.